UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-10031-GAO

JONATHAN DOUCETTE,
Plaintiff,

v.

CARMAX AUTO SUPERSTORES INC.,
Defendant.

OPINION AND ORDER
March 23, 2020

O'TOOLE, S.D.J.

Jonathan Doucette brings this action on behalf of himself and all others similarly situated against his former employer, CarMax Auto Superstores Inc. Doucette alleges that CarMax failed to pay minimum wages, overtime wages, and Sunday premium pay in violation of the Fair Labor Standards Act, 29 U.S.C. § 207 (Count I), state minimum, overtime, and unpaid wage laws (Counts II–IV), and contractual compensation policies (Count V). CarMax has moved to dismiss the complaint and compel arbitration, which Doucette opposes.

## I. Factual Background

CarMax is a car retailer.[1] It is one of the largest car retailers in the country, with sales locations in 41 states. It offers a large selection of vehicles by making its nationwide inventory of approximately 70,000 vehicles available for potential customers to view online. Upon request, CarMax will transfer a vehicle from its inventory to a local store for a customer. It also offers home delivery for test drives and purchases. These features apparently permit CarMax a competitive

---

[1] This summary is taken as true for purposes of the present motion. Doucette reserves the right to challenge any of the factual allegations in other contexts.

advantage because they allow a single CarMax store to offer access to a much larger selection of vehicles than a traditional auto retailer. Of the 721,512 cars sold at retail by CarMax in fiscal 2018, approximately 30% of them were transferred by customer request.

CarMax sales consultants are trained to work with customers to find a vehicle in its national inventory that meets a customer's needs. If a car interests a customer, the sales consultant is involved in arranging for its transport from one location to the customer's location. In many cases, the desired vehicle is in a different state than the customer. Additionally, sales consultants respond to inquiries from other CarMax locations that may be out of state and arrange for the transport of vehicles from the consultant's location to a location in another state for a customer to view. CarMax employs dedicated drivers to transport vehicles between stores but sales consultants like Doucette also sometimes personally transport vehicles for customers. "Assist[ing] in auctions and the vehicle appraisal process, including . . . vehicle transportation" is listed as one of the principle duties and responsibilities of a sales consultant, though there is no requirement under the job specifications that an employee have a driver's license or any related driving experience. (Decl. of Karen Holt Ex. C at 1 (dkt. no. 8).)

Doucette was a sales consultant trainee and then a sales consultant for CarMax in 2016. As part of the CarMax hiring process, Doucette agreed to several pertinent terms regarding dispute resolution. First, he consented to CarMax's "Dispute Resolution Agreement" (the "DRA"). The DRA provided in relevant part:

> Except as set forth below, and as more fully set forth in the CarMax Dispute Resolution Rules and Procedures, both CarMax and I agree to settle any and all previously unasserted claims, disputes, or controversies arising out of or relating to my application or candidacy for employment and employment and/or cessation of employment with CarMax, exclusively by final and binding arbitration before a neutral Arbitrator. By way of example only, such claims include claims under federal, state and local statutory or common law, such as the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, as amended, including

the amendments of the Civil Right Act of 1991, the Americans with Disabilities Act, the Family Medical Leave Act, and the law of contract and law of tort. The scope of the claims covered, as well as certain exclusions from coverage and other important terms, are set forth in the Dispute Resolution Rules and Procedures.

I understand that if I do file a lawsuit regarding a dispute arising out of or relating to my application or candidacy for employment, employment, or cessation of employment, CarMax may use this Agreement in support of its request to the court to dismiss the lawsuit and require me instead to use arbitration.

I understand that nothing in this Agreement is intended to affect or limit my rights under the National Labor Relations Act and my right to file charges or seek other relief with the Equal Employment Opportunity Commission or similar federal, state, or local agency, but that upon receipt of a right-to-sue letter or similar administrative determination, I shall arbitrate any claim that I may have against CarMax that is covered by this Agreement or the Rules. I agree that if I commence an arbitration, it will be conducted in accordance with the CarMax Dispute Resolution Rules and Procedures.

. . .

This Agreement will be enforceable throughout the application process, my employment, and thereafter with respect to any such claims arising from or relating to my application or candidacy for employment, employment or cessation of employment with CarMax. We then must arbitrate all such employment-related claims that are within the scope of this Agreement and the Rules, and we may not file a lawsuit in court.

(Decl. of Karen Holt Ex. B at 5–6.)

Doucette in turn agreed to CarMax's Dispute Resolution Rules and Procedures ("DRRP").

Rule 2 of the DRRP stated in relevant part:

Except as otherwise limited herein, any and all employment-related legal disputes, controversies or claims arising out of, or relating to, an Associate's application or candidacy for employment, employment or cessation of employment with CarMax or one of its affiliates shall be settled exclusively by final and binding arbitration before a neutral third-party Arbitrator selected in accordance with these Dispute Resolution Rules and Procedures. Arbitration shall apply to any and all such disputes, controversies, or claims whether asserted against the Company and/or against any employee, officer, alleged agent, director, or affiliate company.

All previously unasserted claims arising under federal, state or local statutory, or common law, shall be subject to arbitration. Merely by way of example, these claims include, but are not limited to, claims arising under . . . the Fair Labor Standards Act (FLSA) . . . .

3

(Id. Ex. D Rule 2.) Rule 3 provided:

> By agreeing to the Dispute Resolution Program, both CarMax and the Associate agree to resolve through arbitration all claims described in, or contemplated by Rule 2. If either Party files a lawsuit in court to resolve claims subject to arbitration, both Parties agree that the Court shall dismiss the lawsuit and require the Parties to arbitrate the dispute.
>
> If either Party files a lawsuit in Court involving claims which are, and other claims [which] are not, subject to arbitration, both Parties agree that the court shall stay litigation of the nonarbitrable claims and require that arbitration take place with respect to those claims subject to arbitration.

(Id. Rule 3.) Finally, according to Rule 9(f):

> The Arbitrator shall not consolidate claims of different Associates into one proceeding, nor shall the Arbitrator have the power to hear an arbitration as a class action, collective action, or representative action. (A class action involves an arbitration or lawsuit where representative members of a large group who claim to share a common interest seek collective relief).

(Id. Rule 9.)

## II.     Discussion

In its motion to dismiss and compel arbitration, CarMax contends that Doucette agreed to arbitrate any claims against CarMax and that he cannot bring an action on behalf of others because he agreed that the arbitrator would not have the power to hear class, collective, or representative actions. Doucette disagrees, arguing that he is a "transportation worker" expressly exempt from the provisions of the Federal Arbitration Act and consequently that he is able to bring his putative class action in court or in arbitration.

### A.     Transportation Worker Exemption

The Federal Arbitration Act (the "FAA") was enacted by Congress in 1925 "in response to widespread judicial hostility to arbitration." Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 232 (2013). To give effect to this purpose, the FAA requires judicial enforcement of a wide range of written arbitration agreements. Section 2 provides that "[a] written provision in . . . a contract

evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability." Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).

There are some exceptions from the broad federal policy favoring resolution of disputes through arbitration. In relevant part, Section 1 of the FAA exempts from the statute's broad coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The question whether an employee is a member of a "class of workers engaged in foreign or interstate commerce" is a determination the court must make before compelling arbitration. See New Prime Inc. v. Oliveira, 139 S. Ct. 532, 537 (2019).

It does not appear that the First Circuit has explored in detail the scope of the so-called "transportation worker" exemption set forth in § 1.[2] However, at least two judges in this district have applied a non-exclusive list of factors synthesized by the Eighth Circuit to determine whether an employee fits within § 1:

> [F]irst, whether the employee works in the transportation industry; second, whether the employee is directly responsible for transporting the goods in interstate commerce; third, whether the employee handles goods that travel interstate; fourth,

---

[2] In Oliveira v. New Prime, 857 F.3d at 17 & n.14 (1st Cir. 2017), the parties agreed that the plaintiff was a transportation worker within the meaning of the exemption. In Dickstein v. duPont, 443 F.2d 783, 785 (1st Cir. 1971), the court rejected an argument that an account executive at a brokerage firm was a worker engaged in foreign or interstate commerce, explaining only that the courts have "generally limited this exception to employees, unlike appellant, involved in, or closely related to, the actual movement of goods in interstate commerce."

5

whether the employee supervises employees who are themselves transportation workers, such as truck drivers; fifth, whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; sixth, whether the vehicle itself is vital to the commercial enterprise of the employer; seventh, whether a strike by the employee would disrupt interstate commerce; and eighth, the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties.

Lenz v. Yellow Transp., Inc., 431 F.3d 348, 352 (8th Cir. 2005) (finding that customer service representative for interstate trucking company was not a transportation worker exempt from FAA); accord Austin v. DoorDash, Inc., No. 1:17-CV-12498-IT, 2019 WL 4804781, at *3–4 (D. Mass. Sept. 30, 2019) (applying Lenz factors to find that driver for food delivery service was not a transportation worker exempted from FAA); Waithaka v. Amazon.com, Inc., 404 F. Supp. 3d 335, 342–43 (D. Mass. 2019), *appeal argued* Waithaka v. Amazon.com, Inc., 19-1848 (Feb. 6, 2020) (applying Lenz factors to find that last-mile delivery drivers from Amazon fell within transportation worker exemption).

The parties do not address the appropriateness of using the Lenz factorial approach to understanding the proper scope of the transportation worker exemption, and I do not decide that question. If that approach is used, however, it supports the conclusion that Doucette is *not* a transportation worker within the meaning of § 1. First, and perhaps most significantly, unlike seamen and railroad workers, it does not appear that Doucette is within a class of employees for which special arbitration procedures already existed or were imminent when Congress enacted the FAA. See, e.g., Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 121 (2001) ("By the time the FAA was passed, Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers. When the FAA was adopted, moreover, grievance procedures existed for railroad employees under federal law, and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was

imminent. It is reasonable to assume that Congress excluded 'seamen' and 'railroad employees' from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers." (internal citations omitted)).

Furthermore, Doucette did not work in what could fairly be regarded as the transportation industry. CarMax is a car dealership. The goods CarMax sells may be vehicles and the company's ability to move cars from its national inventory to its customers may be integral to its model, but the business is more akin to the electronics store selling electronics that had traveled across state lines, see Circuit City Stores, 532 U.S. at 109, than it is a railroad or cargo shipping company. Additionally, although Doucette helped arrange the transport of vehicles from one location to the customer's location, which sometimes involved crossing state lines, Doucette himself was not directly responsible for transporting the cars in interstate commerce[3] and did not supervise employees who themselves were transportation workers. Doucette could perform his duties—"sell[ing] vehicles by providing exceptional customer service," "listen[ing] and respond[ing] to customer needs," "[a]ssist[ing] with vehicle selection and answering questions," "[m]aintain[ing] a working knowledge of available inventory, financing options, titles, and extended service policies," "[p]rocess[ing] paperwork," "[m]aintain[ing] customer base," "[m]aintain[ing] sales area," etc.—without an actual vehicle. (Decl. of Karen Holt Ex. C.) That is, although Doucette was responsible for helping customers find the right cars, Doucette himself did not use a vehicle to carry out his duties, as compared with, for instance, a FedEx driver who travels from state to state to deliver goods. And, unlike seamen or railroad workers, there is no indication that a strike by sales consultants like Doucette would disrupt interstate commerce.

---

[3] CarMax aptly compares Doucette's role to that of a retail salesperson who checks the inventory of other stores and arranges the shipment of particular items to his store or the customer's home.

Consequently, Doucette is not sufficiently engaged in the actual movement of goods in interstate commerce to qualify under the FAA's narrow exemption for transportation workers.

B.   Class Claims

The second issue involves Doucette's putative class claims. CarMax contends that Doucette waived any power to bring a class action in court or in arbitration. It acknowledges that neither the DRA nor the DRRP use the term "waiver," but it claims they "make clear that [Doucette] must bring all claims in arbitration and not in court," that the claims that must be arbitrated "include all claims relating to [Doucette's] employment and specifically references the Fair Labor Standards Act," and that class arbitration is disallowed in Rule 9. (Def.'s Reply Mem. in Supp. of its Mot. to Dismiss & Compel Arbitration 5–6 (dkt. no. 17).) Doucette for his part advances a set of alternate arguments and asks the Court to conclude that regardless whether the FAA applies, he is entitled to pursue his class claims either in court or in arbitration.

As to class arbitration, CarMax cannot be compelled to arbitrate Doucette's asserted class claims because it never agreed to do so. See Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 685 (2010) ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." (emphasis in original)); Schwartz v. CACH, LLC, No. CIV.A. 13-12644-FDS, 2014 WL 298107, at *2 (D. Mass. Jan. 27, 2014) ((quoting Stolt-Nielsen, 559 U.S. at 685)); Karp v. CIGNA Healthcare, Inc., 882 F. Supp. 2d 199, 206 (D. Mass. 2012). Indeed, the parties expressly agreed that class arbitration would *not* be available. Rule 9 of the DRRP unambiguously states that the arbitrator "shall not consolidate claims of different Associates into one proceeding, nor shall the Arbitrator have the power to hear an arbitration as a class action, collective action, or representative action." (Decl. of Karen Holt Ex. D Rule 9.)

As to class litigation, Doucette is unable to litigate his class claim in this Court. "In order to maintain a class action, a plaintiff must have an individual claim; [h]e cannot serve as a class representative without such a claim." Karp, 882 F. Supp. 2d at 207. As discussed above, Doucette agreed to arbitrate his claims and he therefore cannot serve here as a class representative.

### III. Conclusion

For the foregoing reasons, CarMax's Motion to Dismiss and Compel Individual Arbitration (dkt. no. 6) is GRANTED. The action is DISMISSED and Doucette must arbitrate his individual claims against CarMax.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.  
Senior United States District Judge